IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 2, 2025

## STATE OF TENNESSEE v. DALE MAURICE TEAGUE

**Appeal from the Circuit Court for Carroll County**
**No. 24CR61    Bruce Irwin Griffey, Judge**
_____

**No. W2025-00268-CCA-R3-CD**
_____

The Carroll County Grand Jury indicted the Defendant, Dale Maurice Teague, with unlawful possession of a firearm by a convicted felon (Count 1), possession of marijuana (Count 2), possession with the intent to use drug paraphernalia (Count 3), and possession of a prohibited weapon, to wit, knuckles (Count 4).   After the trial court granted a motion for judgment of acquittal on the marijuana count, the jury convicted the Defendant of the remaining offenses, and the trial court imposed an effective eighteen-year sentence.   On appeal, the Defendant argues:  (1) the evidence is insufficient to sustain his convictions for the possession of a firearm by a convicted felon and possession of a prohibited weapon, knuckles; (2) the State violated two pretrial orders that resulted in the improper admission of hearsay and prior bad act evidence; and (3) the trial court erred in denying his initial motion to suppress and in denying his motion to reconsider the motion to suppress.  After review, we affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and JILL BARTEE AYERS, J., joined.

Steven L. West, Huntingdon, Tennessee, for the appellant, Dale Maurice Teague.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; J. Neil Thompson, District Attorney General; and Michael Thorne, Adam Jowers, and Andy Clark, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In January 2024, the Defendant was indicted for unlawful possession of a firearm by a convicted felon, possession of marijuana, possession of drug paraphernalia, and possession of a prohibited weapon, to wit, knuckles.

**Motion in Limine.** On August 14, 2024, the Defendant filed a motion in limine, seeking to restrain the State from any reference to alleged prior bad acts by him or to any hearsay evidence without first requesting a jury-out hearing. Specifically, the Defendant sought to prohibit the State or its witnesses from "blurting out" any prior bad acts or hearsay evidence. The trial court granted this motion and entered orders to that effect.

**Motion to Suppress.** On August 23, 2024, the Defendant filed a motion to suppress the alleged contraband that was seized, claiming only that the search warrant erroneously stated that the property to be searched was located in Weakley County rather than in Carroll County. On August 26, 2024, the trial court, noting that this matter had come before it "upon the Motion to Suppress and upon the Court reviewing the record as a whole[,]" entered an order simply stating that the "Motion to Suppress is denied."

**Trial.** Joey Hedge, an employee of the Huntington Police Department and an investigator with the TBI Drug Task Force, testified that he obtained a search warrant to search for drugs at the Defendant's residence at 208 Randle Drive, McKenzie, Tennessee, which resulted in the discovery of the Defendant's handgun, knuckles, and other items. He stated that the search warrant he obtained listed the Defendant and Brianna Howard as the occupants of the home at the Randle Drive address.

Investigator Hedge explained that he, members of the TBI Task Force, and other law enforcement executed the search warrant at 208 Randle Drive around 7:15 a.m. on August 17, 2023. After an officer knocked and announced his presence and no one answered the door, the officers forcibly entered the home. As they worked to secure the home, officers observed a school-age girl asleep on the sofa, and they woke her up. Investigator Hedge quickly located the Defendant in the rear bedroom of the residence. He said the Defendant was in a "squatting position, reaching between the mattresses." He clarified that the Defendant's hand was between the mattress and the box springs. Although Investigator Hedge and the other officers ordered the Defendant to show him his hands multiple times, the Defendant did not immediately comply. Instead, the Defendant "turned like he was going to head toward[] the bathroom," and when the officers told him to come back, the Defendant finally returned after a few seconds. At that point, the officers placed the Defendant in handcuffs and took him to the living room. Investigator Hedge stated that there was a woman, who was not Brianna Howard, lying on the opposite side of the bed from where the Defendant had been reaching under the mattress. The officers also took this woman into custody, although no charges were ever filed against her, and brought her into the living room.

After assisting in securing the three people in the home, Investigator Hedge returned to the rear bedroom and searched the area where he saw the Defendant reaching between the mattress and the box springs. Although he believed he would find drugs, Investigator Hedge found a Taurus 9mm handgun under the mattress, which was loaded with seventeen live rounds. He collected this handgun and identified it at trial.

In this bedroom, Investigator Hedge also found a plastic baggie of marijuana, a digital scale covered with a crystal-like residue resembling methamphetamine, and brass knuckles inside the nightstand. He also found a second digital scale with a slight residue of marijuana and an empty baggie on top of the nightstand. He acknowledged that he never field tested the residue on these digital scales. Investigator Hedge asserted that in his experience, drug dealers used scales and plastic baggies to measure and sell drugs. Also based on his experience, he identified the substance in the bag on the nightstand as marijuana, rather than legal hemp, and estimated that it weighed approximately ten grams. Investigator Hedge stated that officers later discovered a safe in this bedroom that contained several different types of ammunition, including 9mm rounds that matched the rounds in the Taurus handgun and some nine-millimeter magazines that did not fit into the Taurus handgun.

Investigator Hedge was aware, when executing the search in this case, that the Defendant was a convicted felon. He arrested the Defendant and charged him with unlawful possession of a firearm by a convicted felon, possession of marijuana, possession of drug paraphernalia, and possession of brass knuckles, a prohibited weapon.

On cross-examination, Investigator Hedge admitted that he did not have any forensic test results showing that the substance in that plastic baggie in the nightstand was marijuana, explaining that with a small amount of marijuana, like the one in this case, officers never sent it to the lab for testing. He also acknowledged that the brass knuckles, digitals scales, bag of marijuana, safe, ammunition, and handgun were not examined for fingerprints.

Investigator Hedge acknowledged that he mistakenly listed Weakley County, rather than Carroll County, on the search warrant. He said he later discovered that the residence at 208 Randle Drive was located in Carroll County.

Investigator Hedge stated that he believed that the Taurus handgun belonged to the Defendant because the Defendant was reaching for it under the mattress as he entered the room. He did not see the Defendant reaching for his shoes, which were by the bed. He admitted that the Taurus handgun was not in plain view, where anyone could see it, when he entered the room. Instead, he only saw the Defendant's hand under the mattress.

Investigator Hedge acknowledged that after the search warrant was executed, the Defendant's sister, Dominique Teague, claimed ownership of the Taurus 9mm gun and claimed that "she had accidentally left the gun in [the Defendant's] car." Investigator Hedge asserted that he did not believe the gun belonged to Dominque Teague. His investigation showed that the Taurus 9mm handgun was not stolen, although he had not confirmed whose name the gun was in.

Investigator Hedge stated that the Taurus handgun was underneath the middle area of mattress's length, approximately one foot back from the edge. He acknowledged that no one saw the Defendant in actual possession of the Taurus handgun. He also admitted that he was unable to get fingerprints from the handgun, but claimed that it was difficult to get the TBI to test for fingerprints.

On redirect examination, the State asked if Dominique Teague lived at 208 Randle Drive, and Investigator Hedge replied that she did not. He asserted that the Taurus 9mm handgun was not found in the Defendant's car.

Following Investigator Hedge's testimony, the trial court granted the Defendant's motion for judgment of acquittal on the possession of marijuana charge in Count 2 because the State was unable to prove beyond a reasonable doubt that the substance was marijuana.

The Defendant testified on his own behalf. He admitted that he lived at 208 Randle Drive with the mother of his children, Brianna Howard. The Defendant asserted that when the officers entered his bedroom, he was "bending down to put [his] shoes on[,]" which were "[r]ight beside the bed." The Defendant denied possessing the gun found under his mattress and claimed that he did not know the gun was there. He maintained that the day of trial was the first time he had ever seen that gun. However, he acknowledged that the brass knuckles and the digital scales belonged to him. He admitted he used the digital scales because he "smoke[d] weed" and sometimes weighed it. However, he asserted that he never tested the THC levels in the substance he smoked to determine whether it was marijuana or hemp.

On cross-examination, the Defendant admitted he did not buy the green leafy substance in a store and he believed the substance was marijuana when he purchased it. He also admitted that he used the digital scales to measure and weigh the marijuana. He confirmed that the brass knuckles belonged to him. The Defendant also conceded that he was a convicted felon and had three prior felony convictions for manslaughter, robbery, and failing to appear in court. He admitted that because of his prior felony convictions he was prohibited from owning, possessing, or being around a firearm. The Defendant stated that although his sister, Dominique Teague, had claimed ownership of the gun, he had

- 4 -

never known her to own the Taurus handgun.  However, the Defendant claimed that his sister owned the safe inside his bedroom.

The Defendant said he did not know how the Taurus 9mm handgun got under his mattress, and he denied reaching for this gun.  He agreed that it was the jury's responsibility to determine if it believed Investigator Hedge's testimony or his own testimony regarding whether he reached for the gun.  However, he admitted that everything else, namely the marijuana, the digital scales, the drug paraphernalia, and the brass knuckles, belonged to him.  When asked why his sister would hide a gun under his bed, the Defendant said, "I don't know; I couldn't tell you."  The Defendant admitted that the gun was hidden a foot inside the mattress's edge on the side of the bed on which he slept.

Following the Defendant's testimony, the trial court granted the Defendant's motion for judgment of acquittal as to Count 2, charging the Defendant with possession of marijuana.  The court informed the jury that it had granted the Defendant's request to dismiss Count 2 because the State did not prove beyond a reasonable doubt that the substance was marijuana and not hemp.  The court then stated, "You should not concern yourself any further with that count."  The trial court also instructed the jury that the Defendant had stipulated that he was a convicted felon, which was the qualifying felony conviction for the unlawful possession of a firearm charge.

At the conclusion of the trial, the jury found the Defendant guilty of possession of a firearm by a convicted felon, possession of drug paraphernalia, and possession of a prohibited weapon.  Following a sentencing hearing, the trial court imposed an effective sentence of eighteen years for these convictions.  On November 1, 2024, the State entered a nolle prosequi on the possession of marijuana charge.

**Motion to Reconsider and Motion for New Trial.**  After the sentencing hearing, the Defendant filed a premature, but timely, motion for new trial.  The Defendant then filed an amended motion for new trial including a motion to reconsider his motion to suppress. In this filing, the Defendant alleged that the evidence was insufficient to sustain his conviction for unlawful possession of a firearm by a convicted felon, that the State had violated two pretrial orders resulting in the improper admission of hearsay and prior bad act evidence, that the trial court should reconsider its denial of the motion to suppress in light of United States v. Pettigrew, 2024 WL 4800197 (W.D. Tenn. Nov. 15, 2024), and that the good faith exception in United States v. Leon, 468 U.S. 897 (1984), should not be used to salvage this otherwise invalid search.

At this hearing, defense counsel first asked the trial court to reconsider his motion to suppress in light of Pettigrew, which was decided after the Defendant's trial.  Defense counsel argued that the court must consider the good faith of an officer but must also

consider whether the officer had a reckless disregard for factual matters or a reckless disregard for the truth of the information he or she included in the affidavit for the search warrant. He argued that if an officer recklessly disregarded the truth of the information included in an affidavit, the court must consider whether the remaining evidence in the affidavit was sufficient to establish probable cause to issue the warrant. Defense counsel claimed that Investigator Hedge had recklessly disregarded the truth in drafting the affidavit in this case when he erroneously stated that the Defendant's residence was in Weakley County rather than Carroll County.

Second, defense counsel asserted that the statement in the affidavit that the Defendant had been selling methamphetamine from his residence at 208 Randle Drive was a conclusory statement because there was no description as to when that information was received and no information as to the time period when this occurred. When the trial court mentioned that the affidavit also stated that the informant had been in the residence and had witnessed methamphetamine being sold there in the last forty-eight hours, defense counsel replied that it was "addressing one statement at a time." The trial court then stated,

> You've got to read the whole affidavit, the four corners of it, . . . at the same time. You don't get to pick out certain parts . . . [the affidavit's] got a very specific statement right next to it, backing it up, saying that the confidential informant actually witnessed [the Defendant] selling . . . meth[amphetamine] at the residence.

Third, defense counsel asserted that although the affidavit stated that the informant had witnessed the Defendant selling methamphetamine within forty-eight hours, it did not say "within 48 hours of when." The trial court responded that it was "going to presume that would have been within 48 hours of when this was submitted to [the judge][.]" The court noted that the affidavit was sworn to the judge on or about August 16, 2023, and it interpreted the affidavit to mean that the observed selling of methamphetamine occurred within forty-eight hours of August 16, 2023. Defense counsel insisted that "it doesn't give a date," and the trial court found that this argument was not persuasive. Defense counsel argued although you must look at the affidavit in its entirety, "there [were] a lot of specifics missing" in this affidavit.

Fourth, defense counsel took issue with the affidavit stating that the informant had been reliable and accurate on "all occasions" because there was no information regarding how many occasions there were. He noted that it "could be one, it could be two, it could be ten" but the judge had to guess how many occasions there were.

Fifth, defense counsel contended that there was no corroboration regarding the accuracy or reliability of the confidential informant, other than Investigator Hedge's statement that he had seen people coming and going from the residence and staying only a few minutes at a time. Defense counsel noted that the Pettigrew case "made a big deal out of the fact that there w[ere] no controlled buys, that you had a situation where, evidently, there was a lot of drug dealing going on, but no one bothered to do a controlled buy." He noted that in the instant case, there were no controlled drug buys with the Defendant and when the search was finally conducted, there were no drugs uncovered. He observed that although there was allegedly marijuana found, the State did not test it, and that count was dismissed at trial.

Sixth, defense counsel claimed that although the affidavit stated that a record from the Carroll County Electric Department showed the Defendant living at 208 Randle Drive on August 3, 2023, the record actually only indicated that the electric bill should be sent to the Defendant. He also asserted that the fact that the record was from the Carroll County Electric Department should have clearly indicated to Investigator Hedge that the Defendant resided in Carroll County, not Weakley County. He asserted that this was proof that Investigator Hedge had "reckless disregard" for the truth of this statement because he had documentation showing the Defendant lived in Carroll County.

At the hearing, the defense called Investigator Hedge to testify. When defense counsel asked Investigator Hedge if he had dates for the numerous occasions of drug trafficking at the Defendant's address, he stated that he did not, although he had received information about drug trafficking at that address "multiple times." Investigator Hedge also asserted that the informant was sold methamphetamine at the Defendant's address within forty-eight hours of the day the judge signed the search warrant. When asked about his statement that the informant had been reliable and accurate on "all occasions," he asserted that the informant had been reliable and accurate on approximately ten occasions. Investigator Hedge stated that he personally observed people going in and coming out of the Defendant's residence. He also said "multiple people" had informed him that the Defendant was selling narcotics at the time he submitted the affidavit. When defense counsel asked about the electric department record, Investigator Hedge acknowledged that the record actually stated that the Defendant was responsible for the electric bill at that address, not that he lived at that address. However, he asserted that he knew the Defendant lived there based on other information and that the electric department record corroborated this information. When asked why he listed Weakley County for the address in the affidavit, if the electric department record was from Carroll County, Investigator Hedge replied that the address was nearly on the line between the two counties, that when he looked up the address on the computer it stated that it was in Weakley County, and that he only determined that the Defendant's address was in Carroll County after talking to the McKenzie chief of police the day the search warrant was

executed. Investigator Hedge added that there were discussions about which jail to take the Defendant because of the residence's location. He said he had a Weakley County officer there to ensure that the Defendant was taken to the proper jail. Investigator Hedge acknowledged that although he could have talked to the McKenzie chief of police before filing this affidavit, he did not. When asked if he agreed that Weakley County was the incorrect county, Investigator Hedge replied, "Well, sort of. It's hard . . . to tell because it's right there on the line."

After the conclusion of this testimony, the trial court distinguished the Pettigrew case, noting that the affidavit in Pettigrew contained the following incorrect identifying information: the individual's name, gender, ethnicity, date of birth, social security number, and address. He asserted that the officer in Pettigrew admitted that he used a template from a prior warrant and that he failed to thoroughly update all details. The trial court then asked whether 208 Randle Drive was near the Weakley County and Carroll County line, and defense counsel replied that this was true. The prosecutor interjected that 208 Randle Drive came within "feet" of Weakley County.

The trial court held that inserting Weakley rather than Carroll County was not "misleading" or an "omission" because the address was located so close to the line between the counties. It also found that this statement did not undermine the veracity and strength of the probable cause for the search warrant.

Regarding the statement of forty-eight hours, the trial court found that the proof showed the informant observed drugs at the address within forty-eight hours of the judge signing the search warrant. Accordingly, it concluded that this statement was not inaccurate.

As to the statement that the informant had been "reliable and accurate on all occasions," the trial court found that based on the four corners of the affidavit and the testimony by Investigator Hedge at this hearing, it did not find that statement misleading or an inaccurate statement.

Regarding the claim that the statement that there were people seen coming and going from the Defendant's residence provided insufficient corroboration for the informant's information, the trial court observed that this was merely a claim of insufficient corroboration, not a claim that Investigator Hedge's statement was inaccurate.

Lastly, as to the electric department record only stating that the Defendant was responsible for the bill at that address, the trial court stated:

Well, that . . . statement . . . may be technically inaccurate because the actual electric department bills doesn't . . . indicate that [the Defendant] is living there. . . .[I]t does show—the electric bill confirms that [the Defendant] does get the . . . bill for that residence. So, although inaccurate—even if the Court completely excludes that statement, there's clearly more than enough . . . probable cause to believe that drug trafficking . . . offenses are being committed by [the Defendant] at . . . the location that's sought to be searched . . . and there's probable cause to search that residence . . . for illegal activity.

The trial court then denied the motion to reconsider the motion to suppress.

Turning to the Defendant's motion for new trial, defense counsel reminded the trial court that despite obtaining orders prohibiting the State from mentioning prior bad acts and hearsay evidence, the prosecutor during opening statement asserted that the search warrant in this case was issued "for the search of methamphetamine, for cocaine, and for marijuana." The Defendant claimed this was a reference to a prior bad act, which was based on hearsay from the confidential informant. Defense counsel argued that the prosecutor's statement was "highly prejudicial" and entitled the Defendant to a new trial.

Defense counsel also asserted that Investigator Hedge "blurted out" during his trial testimony that the Defendant's sister had stated that the gun belonged to her and that she had left the gun in in the Defendant's car. He argued that the prosecutor compounded this error by stating during closing argument that if the gun had been put in the Defendant's car, how did it get into his bedroom under his mattress. He claimed that this was error and that this error was not harmless because it had an "adverse prejudicial impact on the jury."

The State countered that any error regarding the prior bad acts would have been harmless at most. It also asserted that Investigator Hedge's testimony about the sister's claim regarding the gun was given in response to defense counsel's questioning. The trial court reviewed the record and recognized that defense counsel did not preface his question to Investigator Hedge with a "please answer 'yes' or 'no,'" which defense counsel acknowledged. However, defense counsel insisted that Investigator Hedge's hearsay testimony should be viewed against the background of the trial court's order directing the State to admonish their witnesses not to "blurt out" hearsay evidence. Defense counsel said he knew Investigator Hedge had "a tendency to blurt out hearsay on occasion," which was why he filed the motion in limine pretrial.

At the conclusion of the hearing, the trial court found that although the prosecutor may have included a hearsay statement during his opening statement, the court instructed

the jury that arguments and statements of counsel were not proof and that evidence comes from the witness stand. Regarding Investigator Hedge's testimony, the trial court also found that the Defendant opened the door to this evidence when defense counsel asked if anyone else had claimed ownership of the handgun. Ultimately, the trial court held that the prosecutor's comment during opening statement and Investigator Hedge's response on cross-examination did not affect the outcome of the case. It specifically found that the jury assessed the credibility of the witnesses and determined that the Defendant was not credible. Accordingly, the trial court denied the Defendant's motion for new trial and entered an order to that effect. The Defendant then filed a premature, but timely, notice of appeal.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to sustain his convictions for possession of a firearm by a convicted felon in Count 1 and possession of a prohibited weapon, knuckles, in Count 4. He claims he never had actual possession of the handgun or the knuckles and that the evidence was insufficient to show that he had constructive possession of them. The State responds that the evidence is sufficient to support both convictions. We agree with the State.

Initially, we note that the Defendant failed to cite the relevant law for this issue and failed to reference the portions of the trial record that support his claim. Accordingly, we conclude that the Defendant waived his insufficiency claim. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); see also Tenn. R. App. P. 27(a)(7)(A) (A brief shall contain "[a]n argument . . . setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on[.]"). However, in light of the seriousness of the Defendant's firearm conviction, we will briefly address the sufficiency issue on its merits.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court

evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

It is unlawful to possess a firearm after being convicted of a felony crime of violence. Tenn. Code Ann. § 39-17-1307(b)(1)(A) (Supp. 2023). It is also unlawful to intentionally or knowingly possess certain weapons, including knuckles. Id. § 39-17-1302(a)(6) (Supp. 2023).

A person may possess contraband alone or jointly with others. State v. Copeland, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984). In addition, "[p]ossession may be actual or constructive." State v. Robinson, 400 S.W.3d 529, 534 (Tenn. 2013) (citing State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001)). "While actual possession refers to physical control over an item, constructive possession requires only that a defendant have 'the power and intention . . . to exercise dominion and control over' the item allegedly possessed." State v. Fayne, 451 S.W.3d 362, 370 (Tenn. 2014) (quoting Robinson, 400 S.W.3d at 534). It has also been defined as "'the ability to reduce an object to actual possession.'" State v. Ross, 49 S.W.3d 833, 845-46 (Tenn. 2001) (quoting State v. Transou, 928 S.W.2d 949, 955-56 (Tenn. Crim. App. 1996)).

When viewed in the light most favorable to the State, the evidence is sufficient to sustain the Defendant's conviction for unlawful possession of a firearm by a convicted felon because the proof shows the Defendant had actual possession of the handgun. Investigator Hedge testified that when he first entered the room, the Defendant was squatting next to his bed and was reaching between the mattress and the box springs. When Investigator Hedge demanded that the Defendant show his hands, the Defendant refused to immediately comply and then moved toward the bathroom. After Investigator Hedge took

the Defendant into custody, he searched the bedroom and recovered the loaded Taurus 9mm handgun between mattress and the box springs in the exact area where the Defendant had been reaching. Because the evidence indicated that the Defendant had direct physical control over the handgun when Investigator Hedge first encountered him, a rational jury could have determined that the Defendant had actual possession of the firearm at that time. Moreover, the Defendant admitted at trial and stipulated that he was a convicted dangerous felon.

We likewise conclude that, at the very least, the evidence is sufficient to sustain the Defendant's conviction for this offense because the evidence overwhelmingly establishes that the Defendant constructively possessed the handgun. Investigator Hedge observed the Defendant reaching between the mattress and the box springs, in the exact location where the handgun was found a few minutes later. The Defendant's conduct indicates either that he was hiding the handgun or reaching for the handgun, which connects him to the gun and shows his ability to control it. While Investigator Hedge testified that the Defendant's sister, Dominique Teague, claimed ownership of the handgun and stated that she had left in the Defendant's car, the jury ultimately determined that this claim was not believable, and we reiterate that this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297. Based on this proof, a rational jury could have found that the Defendant had constructive possession of handgun because he was aware of the handgun's presence and had the ability to exercise control over it. See Fayne, 451 S.W.3d at 370; Ross, 49 S.W.3d at 845-46.

Although the Defendant cites the Siner case to support his claim that he did not have constructive possession of the handgun in this case, we conclude that Siner is distinguishable. See State v. Siner, No. W2020-01719-R3-CD, 2022 WL 252354, at *7 (Tenn. Crim. App. Jan. 27, 2022) (concluding that a rational jury could not have found beyond a reasonable doubt that the defendant possessed the weapon located underneath the passenger's seat of the car when "there was no evidence linking him to the weapon or suggesting that he was aware of its presence in the vehicle"). Here, Investigator Hedge observed the Defendant reaching between the mattress and the box springs in the exact area where the handgun was found a few minutes later. Because the Defendant could have easily and immediately reduced this handgun to his actual possession, we do not find Siner persuasive.

Additionally, we conclude that the evidence is sufficient to sustain the Defendant's conviction for possession of a prohibited weapon, knuckles. Investigator Hedge testified knuckles were found inside the nightstand, where the marijuana, digital scales, and plastic baggies were discovered. At trial, the Defendant admitted that the knuckles, marijuana, scales, and baggies belonged to him. Accordingly, we conclude the evidence is sufficient to sustain the Defendant's convictions in Count 1 and Count 4.

**II. Admission of Hearsay and Prior Bad Act Evidence.** The Defendant also contends that the State violated two pretrial orders that resulted in the improper admission of hearsay and prior bad act evidence. First, the Defendant claims the prosecutor violated one of the orders when he quoted information in the search warrant affidavit from the confidential informant during his opening statement. Second, the Defendant asserts that Investigator Hedge violated a court order by "blurting out" hearsay evidence in violation of a court order when he testified that the Defendant's sister claimed ownership of the gun and said she had left her gun in the Defendant's car. He claims this hearsay evidence was later used by the State in its closing argument to claim that the Defendant must have known where his sister had put the gun to obtain it and place it under his mattress.

In response, the State contends that the trial court properly denied the motion for new trial on these grounds. We conclude the prosecutor's brief comment during his opening statement was non-hearsay, and therefore admissible. We also conclude that the prosecutor's comment during opening statement did not constitute a prior bad act of the Defendant and that, even if it was somehow a prior bad act, the Defendant waived this issue. Finally, as for the Defendant's claim that Investigator Hedge "blurted out" hearsay evidence during his testimony, we conclude that the Defendant waived this issue and that in any case, this was non-hearsay evidence.

In determining whether a statement is hearsay and, if so, whether it fits within one of the hearsay exceptions, a trial court may make factual findings and credibility determinations in ruling on an evidentiary motion, and "these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them." Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015) (citing State v. Gilley, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). However, "[o]nce the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule— are questions of law subject to de novo review." Id. (citing State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Therefore, if a statement is not offered to prove the truth of the matter asserted, then it is not hearsay. Generally, hearsay is inadmissible except as provided by the rules of evidence. Tenn. R. Evid. 802.

Rule 404(b) prohibits admission of evidence of a defendant's character, offered for the purpose of proving that he or she acted in conformity with that character, except when

it may be relevant to the defendant's motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. See Tenn. R. Evid. 404(b); State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004). Evidence of other crimes, wrongs, or bad acts may be admissible for these purposes if the following conditions are met:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b) (emphasis added).

"In Tennessee, the admissibility of other-acts evidence will be decided either on a Rule 401/403 analysis, or a Rule 404(b) analysis, depending on whether the evidence reflects upon the character of the accused." State v. James, 81 S.W.3d 751, 759 (Tenn. 2002). While the balancing test for Rule 403 favors admission because evidence is excluded only when the probative value is substantially outweighed by the danger of unfair prejudice, "Rule 404(b) constitutes a more restrictive admissions test, excluding evidence more frequently than the test in Rule 403." Id. at 758 n.6.

This court reviews a trial court's admission of evidence governed by Rule 404(b) for an abuse of discretion so long as the trial court substantially complies with the above requirements; otherwise, this court's review is de novo. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court abuses its discretion "'when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.'" State v. McCaleb, 582 S.W.3d 179, 186 (Tenn. 2019) (quoting Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010)).

Prior to trial, the Defendant filed a motion in limine, seeking to prevent the State from referencing any alleged prior bad acts by him or any hearsay evidence without first requesting a jury-out hearing. As a part of this motion, the Defendant specifically sought to prohibit the State's witnesses from "blurting out" any prior bad acts or hearsay evidence. The trial court subsequently entered an order precluding the State from introducing or eliciting any hearsay statements. The court also entered an order precluding the State from referring to any alleged prior bad acts.

- 14 -

Immediately prior to jury selection, defense counsel reminded the trial court about the orders granting his motions in limine and asked the court to admonish the State and its witnesses not to "blurt out" any alleged prior bad acts by the Defendant. The trial court acknowledged that it had granted the defense's motions and then urged the State to "instruct their witnesses to refrain from mentioning future or prior convictions [by the Defendant]." Defense counsel also asked that the court order the State to instruct their witnesses not to "blurt out" hearsay statements made by another individual without calling that particular individual to testify. When the trial court replied that it would be difficult for it to "make a blanket ruling" regarding hearsay evidence at that point, defense counsel asked that before such evidence is elicited, the parties approach the bench and make an argument outside the hearing of the jury. The trial court encouraged the parties to approach the bench in such circumstances.

First, the Defendant argues that the prosecutor violated these pretrial court orders when he "quoted" information from the search warrant affidavit during his opening statement. He asserts that this information constituted hearsay evidence because it came directly from the information and constituted prior bad act evidence because it referenced the Defendant's alleged possession of drugs as the reason for the search warrant. The Defendant also claims that this evidence had no relevance to the issues presented at trial and that, in any event, the prejudicial nature of the evidence outweighed any slight relevance this evidence might have had.

During the State's opening statement, the prosecutor told the jury that the search warrant in this case was issued "for the search of methamphetamine, for cocaine, and for marijuana, because the information that's contained in that affidavit is related to drug activity." Defense counsel objected, and during the ensuing bench conference, defense counsel argued that the prosecutor was getting into "one of [his] pretrial motion areas" because the search warrant affidavit contained "many, many, many statements of hearsay." When the trial court encouraged the prosecutor to "steer clear" of any hearsay statements, the prosecutor replied that it was not going to include any hearsay statements in its opening. Defense counsel then argued that there was no methamphetamine, cocaine, or marijuana found at the Defendant's residence and that the prosecutor was "just trying to prejudice the jury." The trial court told the parties to "move on," and the prosecutor returned to his opening statement, discussing the issuance and execution of the search warrant as well as the evidence recovered during the search.

Defense counsel, during his opening statement, claimed the State would not present any evidence showing that the substance recovered actually tested positive for marijuana and that the prosecutor had simply mentioned the marijuana to "paint a bad picture" of the

Defendant, so the jury would not look at "the real issue," which was whether the State had proven beyond a reasonable doubt that the Defendant was guilty of the charged offenses.

Pursuant to Tennessee Code Annotated section 20-9-301, the parties in a jury trial have the right to make an opening statement to the court and jury "setting forth their respective contentions, views of the facts and theories of the lawsuit." Opening statements allow the parties to provide a general overview of the nature of the case and to outline the facts each party intends to prove. State v. Sexton, 368 S.W.3d 371, 415 (Tenn. 2012). "Trial courts should allow the presentation of a summary of the facts supportive of the respective theories of the case, only so long as those 'facts are deemed likely to be supported by admissible evidence.'" Id. (quoting Stanfield v. Neblett, 339 S.W.3d 22, 41-42 (Tenn. Ct. App. 2010)). The parties should not refer to facts or conditions that are not admissible in evidence. Id. The courts of this state have traditionally given counsel wide latitude in presenting their position, and a trial court's action in controlling the argument of counsel will not be reversed unless the court abused its discretion. State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978) (citing Smith v. State, 527 S.W.2d 737 (Tenn. 1975)).

Initially, we note that the prosecutor did not reference the Defendant's possession of drugs in his opening statement; instead, the prosecutor stated that the search warrant in this case was issued "for the search of methamphetamine, for cocaine, and for marijuana, because the information that's contained in that affidavit is related to drug activity." We disagree with the Defendant that the prosecutor's brief reference to a search warrant being issued for the search of certain drugs constituted a prior bad act. The prosecutor did not state that all three drugs were found during the search, only that a search warrant was issued to search for these three drugs based on information in the affidavit. Because the prosecutor's statement merely concerned the facts that formed the basis for the search warrant in this case, we do not believe this constituted a prior bad act.

Even if the prosecutor's statement could somehow be characterized as a prior bad act, the Defendant waived any issue concerning the admission of alleged prior bad acts because he never specifically requested a Rule 404(b) hearing on any evidence related to the search for drugs at his residence. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also Tenn. R. Evid. 404(b)(1) (stating that "[t]he court upon request must hold a [Rule 404(b)] hearing outside the jury's presence" (emphasis added)); State v. Jones, 151 S.W.3d 494, 498 n.3 (Tenn. 2004) (declining to consider a Rule 404(b) claim where the defendant failed to request a 404(b) hearing); State v. Gunn, No. W2016-00338-CCA-R3-CD, 2017 WL 4861664, at *12 (Tenn. Crim. App. Oct. 26, 2017) (concluding that the issue was waived because "the defendant did not request a 404(b) hearing" and "the trial court was not obligated to conduct one").

Moreover, the Defendant never requested plain error review of the admission of the alleged prior bad act in his initial brief, never addressed the State's allegation of waiver of the Rule 404(b) issue in his reply brief, and never discussed the factors required for plain error relief. See State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) ("It is the accused's burden to persuade an appellate court that the trial court committed plain error."); State v. Thompson, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) ("Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error relief."). Therefore, we conclude that the Defendant is not entitled to plain error review of this issue.

We also note the prosecutor's reference to the search warrant being issued "for the search of methamphetamine, for cocaine, and for marijuana" did not constitute hearsay evidence because it was not "offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Instead, it was argument provided to explain why the search warrant issued in this case. Here, the trial court addressed the defense's objection during the bench conference. During its preliminary instructions, the trial court told the jury that "the opening statement is not evidence" and that "statements of attorneys are not evidence." During the jury charge, the trial court instructed the jury that "[s]tatements, arguments, and remarks of Counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence" and that "[i]f any statements were made that you believe are not supported by the evidence, you should disregard them." We presume that the jury follows the instructions of the trial court. See State v. Banks, 271 S.W.3d 90, 137 (Tenn. 2008); State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

Second, the Defendant asserts that Investigator Hedge violated the court order by "blurting out" hearsay evidence when he testified that the Defendant's sister claimed ownership of the gun and stated that she accidentally left her gun in the Defendant's car. On cross-examination, the following exchange took place between defense counsel and Investigator Hedge:

Q.     . . . Now, I'm not asking you for what anybody said, okay? Are you aware, on that day, of someone that claimed ownership of [the Taurus 9mm] gun, other than [the Defendant]?

A.     Uh, yes. At the end of the search warrant, yes.

Q.     Okay. So, that person that claimed ownership of the gun, hadn't been charged, has she?

A.      That person wasn't there . . . when we did the search warrant. She
        come up after the fact.

                                    . . . .

Q.      Okay. And who was the person that claimed ownership [of the gun]?

A.      His sister come up after the fact, after we was taking [the Defendant]
        to jail. Ms. Dominique—

Q.      Okay.

A.      –Teague. And she stated she had accidentally left the gun in his car.

Q.      Okay. Thank you for that.

A.      Mm-hmm.

Q.      And obviously, you didn't believe her, so—

A.       No.

                                    . . . .

Q.      All right. Did you ever establish who the owner was?

A.      We ran it, and it just showed no[t] stolen, but we hadn't established
        whose name the gun is in, yet.

Later, the prosecutor argued that the Defendant possessed the Taurus 9mm gun.
Although the Defendant claims the prosecutor referenced the aforementioned hearsay
evidence in his closing when he claimed that the Defendant must have known where his
sister had put the gun in order to obtain it and place it under his mattress, the prosecutor
actually made the following argument during closing:

        [The Defendant] testified [on cross-examination], it's a direct quote,
        . . . "I don't know how that gun got under the bed." Again, [use] your
        common[] sense. . . . I've never had a gun in my home that I didn't know was
        there. And I've certainly never had a safe with ammunition under my bed
        that I didn't know was there—unless it was mine, and I was there intending

- 18 -

to possess it, constructively, actually, whatever.  This gun was in [the Defendant's] bedroom under his bed.  He possessed this gun, unlawfully, as a felon convicted of multiple, violent felonies."

. . . .

By [the Defendant's] own admission, [he is] guilty and guilty on Counts III and IV.  So the deliberation that you're going to have to have—to determine beyond a reasonable doubt is based on Investigator Hedge's testimony, the circumstances, the items that were found in the home within [the Defendant's] actual reach, wh[at] he was close [to] when law enforcement came into his home to execute this search warrant, should let your minds rest at ease that [the Defendant] possessed this gun, unlawfully, as a felon—he actually possessed it and intentionally possessed it.

The record shows that defense counsel elicited this testimony at issue from Investigator Hedge when he inquired at length about another individual claiming ownership of the gun during cross-examination.  See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); State v. Williams, 851 S.W.2d 828, 833 (Tenn. Crim. App. 1992) ("Evidence, even if inadmissible, cannot be the basis for error if elicited by the complaining party."). Defense counsel also failed to object to Investigator Hedge's testimony, likely because a claim that the gun belonged to the Defendant's sister favored his case.  See Tenn. R. Evid. 103(a)(1) (providing that a timely objection is a prerequisite to a finding of error based on the trial court's admission of evidence); State v. Smith, 24 S.W.3d 274, 280 (Tenn. 2000) (reiterating that a failure to object to otherwise inadmissible evidence renders the evidence admissible, notwithstanding any rule of evidence to the contrary).  In any case, we disagree that Investigator Hedge's testimony, relating to Dominque Teague stating that the gun belonged to her and that she accidentally left the gun in the Defendant's car, was hearsay.  This evidence was not offered by Investigator Hedge to prove the truth of the matter asserted because it was not offered to show that Dominque Teague owned the gun and accidentally left it in the Defendant's car.  Instead, Investigator Hedge offered this information to show that Dominique Teague's claimed ownership of the Taurus 9mm gun was not believable.  Because this evidence was actually non-hearsay, the trial court did not err allowing its admission.  Lastly, we note that, despite the Defendant's claim to the contrary, the prosecutor's closing argument did not specifically reference this portion of Investigator's Hedge's testimony, although it could have.

**III. Motion to Suppress.** Lastly, the Defendant maintains that the trial court erred in denying his initial motion to suppress. He also argues that the trial court erred in denying his motion to reconsider the motion to suppress based on United States v. Pettigrew, 2024 WL 4800197 (W.D. Tenn. Nov. 15, 2024), a federal district court order that was entered on November 15, 2024, notably after the Defendant's trial but before the motion for new trial hearing. Specifically, the Defendant claims that the affidavit in his case, which included incorrect statements and omitted important details, significantly altered the judge's assessment of probable cause for the issuance of the search warrant. While conceding that Investigator Hedge had no "malice or ill will," the Defendant maintains that Investigator Hedge "omitted or failed to expand upon critical information" in the affidavit because he "had a misguided belief that certain details were not material to probable cause." The Defendant claims that Pettigrew "made counsel aware of the magnitude of the argument as to the defects" in the search warrant affidavit, and he asserts that because this is a constitutional issue, this court should decide this issue on its merits. He also asserts that the good faith exception recognized in Leon should not be used to salvage this otherwise invalid search. See Leon, 468 U.S. at 907-08 (concluding that "the "substantial social costs" of excluding incriminating evidence outweigh the exclusionary rule's benefit "when law enforcement officers have acted in objective good faith or their transgressions have been minor").

The State responds by arguing that the Defendant waived any issues regarding his initial motion to suppress by failing to include the transcript from the suppression hearing in the record. The State also asserts that the Defendant waived the issues in his motion to reconsider the motion to suppress by failing to raise these issues prior to trial. We agree that the Defendant has waived any issues regarding the court's denial of his initial motion to suppress and that waiver notwithstanding, he is not entitled to plain error review of this issue. We also conclude that the Defendant waived the claims in his motion to reconsider the motion to suppress by not raising them prior to trial and that, in any case, the Defendant is not entitled to relief.

The record shows that on August 23, 2024, the Defendant filed a motion to suppress the alleged contraband that was seized, claiming only that the search warrant affidavit erroneously stated that the property to be searched was located in Weakley County rather than in Carroll County. On August 26, 2024, the trial court, noting that this matter had come before it "upon the Motion to Suppress and upon the Court reviewing the record as a whole[,]" entered an order simply stating that the "Motion to Suppress is denied."

Initially, we observe that the Defendant did not include the transcript from a suppression hearing in the appellate record. As a result, we do not know precisely why the trial court denied the initial motion to suppress because the court's written order, without preamble, states only that the suppression motion was denied. The appellant has a duty to

prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "Where . . . the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this Court is precluded from considering the issue." State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988) (citing State v. Groseclose, 615 S.W.2d 142, 147 (Tenn. 1981); State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing Smith v. State, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)).

We also note that although the Defendant filed a reply brief, he never directly addressed the potential waiver issue, asserting only that his original motion to suppress was "summarily overruled," that "there was not a lengthy [suppression] hearing," and that "the transcript of the Motion for New Trial gives the complete record as to the Motion to Suppress." The Defendant seems to acknowledge that some hearing on his initial motion to suppress occurred, but he fails to include a transcript from this hearing, arguably waiving any issue regarding this motion to suppress. Additionally, the Defendant never asked for plain error review of this issue and never addressed the factors required for plain error relief. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); Bledsoe, 226 S.W.3d at 355 ("It is the accused's burden to persuade an appellate court that the trial court committed plain error."). Even if we accept the Defendant's claim that the trial court denied his initial motion to suppress prior to trial without a substantive hearing, we nevertheless conclude that Defendant is not entitled to relief on his initial motion to suppress.

The Defendant's sole claim in his initial motion to suppress was that the search warrant was defective because the affidavit erroneously stated that the property to be searched was located in Weakley County rather than in Carroll County. The affidavit in this case stated that Investigator Hedge believed that the Defendant and Brianna A. Howard were in possession of methamphetamine, powder cocaine, and marijuana. In two different sections, the affidavit asserted that the premises to be searched were in Weakley County, rather than Carroll County. As a part of the affidavit, Investigator Hedge detailed directions to the identified address as well as a photograph of the trailer located at this address.

At the hearing on the motion to reconsider the motion to suppress, the trial court asked the parties whether 208 Randle Drive was near the Weakley County and Carroll

County line, and defense counsel confirmed that this was true. The prosecutor quickly added that 208 Randle Drive came within "feet" of Weakley County. At that point, the trial court determined that the inclusion of Weakley rather than Carroll County in the affidavit was not "misleading" or an "omission" because this address was located so close to the line between the counties. The trial court then held that this minor oversight did not undermine the veracity and strength of the probable cause for the search warrant. We fully agree with the trial court's conclusion. Even if we only consider the remaining information in the affidavit, "the evidence viewed as a whole provided the magistrate with a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing." State v. Tuttle, 515 S.W.3d 282, 299 (Tenn. 2017) (citations and internal quotation marks omitted)).

Next, we must consider whether the trial court erred in denying the motion to reconsider the motion to suppress. Relying on Pettigrew, the Defendant claims he is entitled to a new trial because the following errors and omissions in the affidavit make the search warrant defective: (1) the affidavit erroneously stated that the residence to be searched was in Weakley County, despite the fact that Investigator Hedge had a document from the Carroll County Electric Department stating that the Defendant was responsible for the electric bill; (2) the affidavit omitted information as to when Investigator Hedge received the information from the informant that the Defendant had been selling methamphetamine from 208 Randle Drive and included a conclusory statement that 208 Randle Drive was the Defendant's residence without any substantiation; (3) the affidavit omitted the date and time when the informant had been inside the residence and witnessed the methamphetamine being sold; (4) the affidavit omitted corroboration regarding the accuracy and reliability of the paid confidential informant, with Investigator Hedge stating only that the informant had been reliable and accurate "on all occasions," failing to implement a controlled drug buy at this address, and providing no corroboration of drug trafficking other than his observation of unidentified individuals, who were not arrested on narcotics charges, staying only a few minutes at the residence before leaving; (5) the affidavit erroneously stated that an electric department document showed that the Defendant lived at 208 Randle Drive, when this document only established that the Defendant was responsible for paying the electric bill at that address. The Defendant argues that the "omission of such significant details directly affected the issuing judge's ability to assess source credibility and operational integrity." He also asserts that the "wording of the affidavit evidences an intent by [Investigator] Hedge to present a stronger case for probable cause th[a]n actually existed." See Pettigrew, 2024 WL 4800197, at *4. He asserts that the inclusion of the erroneous and omitted information in the affidavit was "material" and was given with "the intent to mislead," and he claims that when the erroneous information is corrected and the omitted information is included, no probable cause exists to support the issuance of the warrant in his case. The Defendant also asserts

that the good faith exception in <u>Leon</u> should not be used to salvage this otherwise invalid search.

In <u>Pettigrew</u>, an unreported order from the Western Division of Tennessee, the United States District Court reiterated that under <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978), "a defendant is entitled to a hearing to challenge a search warrant affidavit if he makes a substantial preliminary showing that the affidavit contains <u>deliberate falsehoods or statements made with reckless disregard for the truth</u> and that the allegedly false statements were necessary to the finding of probable cause." <u>Pettigrew</u>, 2024 WL 4800197, at *3 (emphasis added) (citing <u>Franks</u>, 438 U.S. at 155-56). However, the court recognized that "[w]hen <u>omissions</u> are at issue, the defendant must show that <u>the affiant intentionally omitted information with the intent to mislead</u> the magistrate judge and that the <u>omission was material</u> to the finding of probable cause." <u>Id.</u> (emphases added) (citing <u>United States v. Atkin</u>, 107 F.3d 1213, 1217 (6th Cir. 1997); <u>Mays v. City of Dayton</u>, 134 F.3d 809, 816 (6th Cir. 1998)). The court noted that even if a search warrant is invalid, evidence obtained pursuant to the warrant may still be admissible under the good-faith exception established in <u>Leon</u>, 468 U.S. 897 (1984). <u>Id.</u> However, it noted that the good-faith exception does not apply when: "(1) the magistrate was misled by information in the affidavit that the affiant knew was false or should have known was false except for his reckless disregard of the truth; (2) the issuing magistrate wholly abandoned his judicial role; (3) the affidavit is so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that the officers cannot reasonably presume it to be valid." <u>Id.</u> (citing <u>Leon</u>, 468 U.S. at 914-23).

The <u>Pettigrew</u> court noted the following "critical omissions" from the affidavit for the search warrant:

> The Confidential Source ("CS") referenced in the affidavit was untested and had never previously worked as a confidential source. . . . Moreover, Mr. Huey, described in the affidavit as an "unwitting party," was, in fact, the original target of the investigation. . . . Additionally, the CS and Mr. Huey made an extended stop at Mr. Huey's grandmother's residence, where Mr. Huey went inside for an extended period. . . . And Mr. Huey was not searched before entering Defendant's residence and, therefore, could have already possessed methamphetamine.
>
> While [Special] [Agent] Williams' judgment was flawed in this instance, his distinguished record of service suggests this was an isolated lapse rather than reflective of his typical practice or professional character . . . . Nevertheless, the Court must conclude that the omission of such significant details, which directly affected the issuing judge's ability to assess

source credibility and operational integrity, evinces an intent to present a stronger case for probable cause than actually existed. See United States v. Cican, 63 F. App'x 832, 837 (6th Cir. 2003) ("A fact finder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations.").

The characterization of Mr. Huey as an "unwitting party" when he was, in fact, the original target of the investigation, coupled with the omission of unmonitored stops at his grandmother's residence where he could have obtained methamphetamine, particularly indicates an intention to mislead the issuing judge about the reliability of the information and the integrity of the controlled operation.

Id. at *4. The court considered, when dealing with omissions from an affidavit, whether it should apply the standard "requiring a showing that the omissions were made knowingly and intentionally or with reckless disregard for the truth" or the more stringent standard requiring a showing that "the affiant omitted the information with the intention to mislead[.]" Id. at *3. The court observed that it was "bound by Sixth Circuit precedent, which establishes that, for omissions [in an affidavit], a defendant must show [(1)] that the affiant intentionally omitted information with an intent to mislead the magistrate judge and [(2)] that the omitted information was material to the finding of probable cause." Id. (emphases added) (citing Mays, 134 F.3d at 816; United States v. Fowler, 535 F.3d 408, 415 (6th Cir. 2008)). Applying this more stringent standard, the court determined that the omissions from the affidavit met both the intent to mislead and the materiality prongs. Id. at *4-5. The court also held that no probable cause for issuance of the search warrant existed when this omitted information was included because the "[t]he combination of unreliable informants, compromised operational controls, and a complete lack of independent corroboration fatally undermine[d] any reasonable inferences that evidence of a crime would be found at the Defendant's residence." Id. at *6. Lastly, the court considered whether the good-faith exception to the exclusionary rule in Leon salvaged the search in this case. Id. Ultimately, the Pettigrew court declined to apply the good-faith exception because "[t]he affidavit contained material omissions made with an intention to mislead—though not maliciously—and when those omissions are corrected, the affidavit is so lacking in probable cause that no reasonable officer could rely upon it." Id. The court then granted the defendant's suppression motion, stating:

[W]hile the Court acknowledges [Special Agent] Williams' long service and the demanding circumstances under which he prepared the affidavit, the omissions were significant enough to require suppression. The deterrent value of excluding evidence obtained through a materially misleading warrant application outweighs the cost of suppression in this

- 24 -

instance. This conclusion is necessary to maintain the integrity of the warrant process and ensure that the issuing judge receives complete and accurate information upon which to base probable cause determinations.

Id. at *7.

Initially, we observe that the trial court should not have heard the Defendant's motion to reconsider the motion to suppress because (1) this motion raised new issues that were not raised by the Defendant in his initial motion to suppress and (2) this motion, which was not filed until after his trial, was untimely. See Tenn. R. Crim. P. 12(b)(2)(C) (requiring that a motion to suppress evidence be made before trial), Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); cf. Neil P. Cohen, et al., Tennessee Law of Evidence § 103[4][b] (6th ed.) (asserting that timely objections to the introduction of evidence (1) permit the trial court to rule on the admissibility of the evidence before it is introduced to the jury, (2) prevent an attorney from holding back an objection but raising it on appeal if an unfavorable verdict is returned, and (3) provide the proponent of the evidence with the chance to offer the evidence by an alternative, non-objectionable method). We also recognize that Pettigrew did not modify federal law regarding errors or omissions in affidavits; instead, it merely applied Sixth Circuit precedent to these suppression issues. See Pettigrew, 2024 WL 4800197, at *3. Consequently, the Defendant should have been well-aware of the federal cases referenced in Pettigrew at the time he filed his initial motion to suppress and should have litigated these issues before his trial, rather than at the motion for new trial stage. Because the Defendant failed to raise his additional suppression issues pretrial, the trial court did not have an opportunity to address these additional suppression issues before the jury returned its verdict. Accordingly, we conclude that the Defendant has waived this issue.

Waiver notwithstanding, the Defendant is not entitled to relief on the issues raised in his motion to reconsider the motion to suppress. In determining whether the trial court erred in denying a motion to suppress, we must consider the following standards:

[Appellate courts should] uphold the trial court's findings of fact, unless the evidence preponderates against them. State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014) (citing State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013); State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well

as all reasonable and legitimate inferences that may be drawn from [the] evidence." Bell, 429 S.W.3d at 529 (citing State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012); Day, 263 S.W.3d at 900; Odom, 928 S.W.2d at 23). The application of law to facts is reviewed de novo, and the appellate court is not obliged to afford a presumption of correctness to the lower court's conclusions of law. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

Tuttle, 515 S.W.3d at 299.

"A sworn and written affidavit containing allegations from which a magistrate may determine whether probable cause exists is an 'indispensable prerequisite' to the issuance of a search warrant." State v. Saine, 297 S.W.3d 199, 205 (Tenn. 2009) (quoting State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998)). When an affidavit seeks to establish probable cause for a search warrant, it must "set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993). "In other words, the affidavit must demonstrate a nexus between the criminal activity, the place to be searched, and the items to be seized." Tuttle, 515 S.W.3d at 300-01 (citing Saine, 297 S.W.3d at 206). "The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence." Smith, 868 S.W.2d at 572.

The issuing judge must employ a totality-of-the-circumstances analysis to determine whether the affidavit establishes probable cause. Tuttle, 515 S.W.3d at 305 (citing Illinois v. Gates, 462 U.S. 213, 230 (1983)). "[U]nder the totality-of-the-circumstances analysis, the informant's basis of knowledge and veracity or credibility remain highly relevant considerations" but "[r]ather than separate and independent considerations, they 'should . . . be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.'" Id. at 308 (quoting Gates, 462 U.S. at 230). "[W]hen suppression of evidence seized pursuant to a search warrant is advocated, the burden is upon the accused to prove by a preponderance of the evidence: (1) the existence of a legitimate expectation of privacy in the place or property from which the items sought to be suppressed were seized; (2) the identity of the items sought to be suppressed; and (3) the existence of a constitutional or statutory defect in the search warrant or the search conducted pursuant to the warrant." Henning, 975 S.W.2d at 298 (emphasis added).

Before applying the totality-of-the-circumstances analysis, we must first consider the Defendant's claim that the affidavit contained false or omitted information in violation

of Franks, 438 U.S. at 154. See Tuttle, 515 S.W.3d at 308. In Franks, the Supreme Court outlined the following process for alleged misrepresentations in the affidavit:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

Franks, 438 U.S. at 155-56. Accordingly, this court must exclude any knowing, intentional, or reckless misrepresentations from the affidavit before evaluating whether it established probable cause. Id.

The Tuttle court held, "'[T]here are two circumstances that authorize the impeachment of an affidavit sufficient on its face[:] (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause[;] and (2) a false statement, essential to the establishment of probable cause, recklessly made.'" Tuttle, 515 S.W.3d at 308 (alterations in original) (quoting State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978)). To establish recklessness, the Defendant must show "that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time." Little, 560 S.W.2d at 407. "Allegations of negligence or innocent mistakes are insufficient to invalidate the search warrant." State v. Yeomans, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999) (citing Franks, 438 U.S. at 171). "The defendant bears the burden of proving the allegation of falsity by a preponderance of the evidence." Tuttle, 515 S.W.3d at 308 (citing Yeomans, 10 S.W.3d at 297; Franks, 438 U.S. at 156).

Here, at the hearing on the motion to reconsider, the trial court immediately distinguished the Pettigrew case, noting that the affidavit in Pettigrew had a substantial number of errors and omissions because the officer had used a template from a prior warrant and had failed to thoroughly update all details. By contrast, the court held that putting Weakley rather than Carroll County in the instant affidavit was not "misleading" or an "omission" because this address was located so close to the line between the counties; it also held this slight misstatement regarding the county did not undermine the veracity and strength of the probable cause for the search warrant. The trial court also determined that the informant provided the information regarding drug trafficking within forty-eight

hours of the judge signing the search warrant, which meant that the statement regarding forty-eight hours in the affidavit was not inaccurate. Regarding the statement that the information provided by the informant had been "reliable and accurate on all occasions," the trial court found that, based on the four corners of the affidavit and Investigator Hedge's testimony, this statement was not misleading or inaccurate. As for the claim that the informant's information was insufficiently corroborated by Investigator Hedge's observation of people coming and going from the Defendant's residence, the trial court noted that this was merely an argument regarding insufficient corroboration, not an argument that this statement was inaccurate. Lastly, regarding the statement that the electric department records showed that the Defendant lived at 208 Randle Drive, the trial court held that while this statement might be "technically inaccurate," the electric bill confirmed that the Defendant was responsible for paying the bill for that residence; it also asserted that even if this statement were excluded from the affidavit, there was more than enough probable cause to believe that drug trafficking offenses were being committed by the Defendant at that residence.

We do not believe that any of the alleged errors or omissions cited by the Defendant rise to the level of "'a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause[;]" or "a false statement, essential to the establishment of probable cause, recklessly made.'" Tuttle, 515 S.W.3d at 308 (quoting Little, 560 S.W.2d at 407). We conclude that the error regarding the county and error regarding the electric department records amounted to "innocent mistakes" that are "insufficient to invalidate the search warrant." Yeomans, 10 S.W.3d at 297. We conclude that if these two statements were excluded from the affidavit, there was still sufficient probable cause to believe that drug trafficking offenses were being committed at this address.

Moreover, when the totality-of-the-circumstances specified in the affidavit are viewed in a commonsense and practical manner, we conclude that the information in the affidavit provided the trial judge with a substantial basis for determining that a search of the 208 Randle Drive property would uncover evidence of wrongdoing. See Tuttle, 515 S.W.3d at 310. Because the affidavit sufficiently established probable cause, we conclude that the trial court did not err in denying the motion to reconsider the motion to suppress.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.

s/ **Camille R. McMullen**
CAMILLE R. MCMULLEN, JUDGE

- 28 -